UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

In re:

FKF 3, LLC,

                               Debtor.

                              Case No. 13-CV-3601 (KMK)

GREGORY MESSER, as Trustee of the FKF TRUST,        OPINION & ORDER

                               Plaintiff,

           -v-

JOHN F. MAGEE, et al.,

                               Defendants.

---

Appearances

Jeffrey A. Reich, Esq.
Reich, Reich & Reich, P.C.
White Plains, NY
*Counsel for Debtor*

Frederick N. Stevens, Esq.
Klestadt & Winters, LLP
New York, NY
*Counsel for Plaintiff*

Michael D. Pinsky, Esq.
Hayward, Parker, O'Leary & Pinsky
Middletown, NY
*Counsel for Defendant John F. Magee*

KENNETH M. KARAS, United States District Judge:

      Plaintiff Gregory Messer, as trustee of the FKF Trust ("Plaintiff" or "Trustee"), brings an

Adversary Proceeding (the "Adversary Proceeding"), asserting several claims against Defendants

John F. Magee ("Magee"), Mitchell L. Klein ("Klein"), Burton R. Dorfman ("Dorfman"),

Melissa A. Magee ("Melissa"), Patrice L. Magee ("Patrice"), Jonathan Magee ("Jonathan"), Lizbeth Magee Keefe ("Lizbeth"), Lawrence J. Keefe, Jr. ("Lawrence"), Valerie Magee ("Valerie"), FKF Holding Company, LP ("FKF Holding"), FKF V Holding Co. ("FKF V Holding"), S.F. Properties, LLC ("SF Properties"), Commercial Construction, Inc. ("Commercial Construction"), Bradley Industrial Park, Inc. ("Bradley"), FKF Edgewater, LLC ("FKF Edgewater"), Aventine Edgewater LLC ("Aventine Edgewater"), FKF Retail LLC ("FKF Retail"), Aventine Retail, LLC ("Aventine Retail"), Jerry's Self Storage, LLC ("Jerry's"), Rose Glasses, LLC ("Rose Glasses"), Bashert Developers, LLC ("Bashert"), TA Group, LLC ("TA Group"), JDJ Holding Co., LLC ("JDJ Holding"), Fasman, Klein & Feldstein, LLP ("FKF Firm"), and Dorfman, Knoebel & Conway, LLP ("Dorfman Firm") (collectively, "Defendants"), in connection with the underlying bankruptcy proceeding of FKF 3, LLC ("Debtor").  Before the Court is Magee's Renewed Motion to Withdraw the Reference to the Bankruptcy Court of the Adversary Proceeding ("Motion").  (Dkt. No. 1.)[1]  For the following reasons, Magee's Motion is granted.

---

[1] The Court notes that the Trustee's filings refer to the Movants as both Magee and Commercial Construction, Inc.  However, the Motion to Withdraw unambiguously refers to Magee as the only Movant.  (*See* Renewed Mot. of John F. Magee to Withdraw the Reference 1 (Dkt. No. 1) ("Movant John F. Magee . . . now moves for the entry of an order withdrawing the reference of this adversary proceeding . . . .").)  The Court thus construes the Motion as having been brought solely on behalf of Magee.

## I.  Background

### A.  Factual Background

#### 1.  Bankruptcy Proceeding and Magee's Proofs of Claim

On July 19, 2010, three creditors filed an involuntary petition against the Debtor (the "Petition"), for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  (Bankr. Ct. Dkt. No. 1.)[2]  On August 9, 2010, the Debtor filed an answer to the Petition and consented to the entry of an order for relief, (Bankr. Ct. Dkt. No. 6), which was entered by the Bankruptcy Court on August 9, 2010, (Bankr. Ct. Dkt. No. 8).  The Bankruptcy Court entered an order on April 18, 2011 confirming the Debtor and Unsecured Creditor Committee's First Amended Joint Plan of Liquidation (the "Plan").  (Bankr. Ct. Dkt. No. 250.)  Under the Plan, all of the Debtor's rights, claims, interests, and assets were transferred to the FKF Trust, and Gregory Messer was appointed as Trustee.  (*Id.* at 16.)

Magee filed two proofs of claim against the Debtor's estate.  On October 4, 2010, Magee filed Claim Number 38, seeking $609,448.46 for money loaned pursuant to an alleged promissory note ("Claim 38").  (Aff. of Michael David Pinsky in Supp. of the Renewed Mot. to Withdraw the Reference ("Pinsky Aff.") Ex. 5 ("Claim 38") (Dkt. No. 2).)  On December 15, 2010, Magee filed amended Claim Number 52 seeking damages from the Debtor in excess of $30 million on account of breaches of fiduciary duty and mismanagement of the Debtor ("Claim 52").  (Pinsky Aff. Ex. 6 ("Claim 52").)  In support of Claim 52, Magee stated:

> John Magee, independently and/or on behalf of entities within his control, asserts a
> contingent claim in the amount of $30,000,000 against [the Debtor], along with a

---

[2] "Bankr. Ct. Dkt." refers to the docket in Debtor's underlying bankruptcy, which can be found at *In re FKF 3, LLC*, No. 10-37170 (Bankr. S.D.N.Y).

contingent, unliquidated claim against the Debtor in an amount yet to be determined by reason of the Debtor's failure, through its Managing Member, Mitchell Klein, to act in good faith on its behalf and on behalf of its Members and creditors; by reason of the Debtor's failure, through its Managing Member, Mitchell Klein, to conduct its business within the scope of authority of its Operating Agreement; by reason of the Debtor's gross negligence and willful misconduct, through its Managing Member, Mitchell Klein, in the operation of its business; by reason of the Debtor's breach, through its Managing Member, Mitchell Klein, to act with such care as a reasonably prudent person in a like position would act under similar circumstances; and for the Debtor's breach, through its Managing Member, Mitchell Klein, of the Debtor's duty of loyalty to its members and to its creditors. John Magee's claim is both a direct and a derivative claim against the Debtor. To the extent John F. Magee's claim is a derivative claim, Mr. Magee respectfully demands that the Debtor take action on his behalf and, to the extent it does not, provides notice that he may do so in its place and in stead [sic].

(*Id.* at unnumbered 4.)  Upon the Trustee's motion, which was contested by Magee, this claim was expunged by the Bankruptcy Court by order dated July 6, 2012.  (Pinsky Aff. Ex. 8.)

### 2. The Adversary Proceeding

On September 12, 2011, the Trustee commenced the Adversary Proceeding by filing the Complaint against Defendants.  (Pinsky Aff. Ex. 3 ("Compl.").)  The Trustee filed an Amended Complaint on January 11, 2013, which incorporated the allegations and claims in the Complaint, and added two additional claims.  (Pinsky Aff. Ex. 4 ("Am. Compl.").)  The following summary of facts is drawn from the Complaint and the Amended Complaint and is considered true for the purpose of resolving the instant Motion.  The Debtor is owned in equal shares by its principals and members Magee, a real estate entrepreneur, Klein, an accountant, and Dorfman, an attorney (collectively, the "Principals").  (Compl. ¶ 2.)  Beginning in 2004, the Principals borrowed on behalf of the Debtor in excess of $60 million from their respective clients, friends, and family members to finance various real estate development projects.  (*Id.*)  As explained to the Debtor's creditors (the "Creditors"), the Debtor's business model was to loan money at a slightly higher

interest rate than it paid to the Creditors and profit from the difference.  (*Id.*)  The Principals also represented to the Creditors that the Debtor's loans and investments were all secured by sufficient collateral to protect the Debtor's principal investment in the event of a default.  (*Id.*)  Most of the Creditors had a close professional and personal relationship with one or more of the Principals, so that the Principals were able to borrow significant amounts of money without providing any more than their representation that the Debtor was a "safe" investment.  (*Id.* ¶ 3.)  Many of the Creditors were longtime clients of Klein's accounting practice and considered Klein to be a close personal friend, and none of the Creditors were banks, institutions, or professional investors.  (*Id.*)

The Principals operated the Debtor free of any oversight or outside review.  (*Id.* ¶ 4.)  The Principals actively solicited investments but did not register the Debtor under the Securities Act of 1933, 15 U.S.C. § 78a, *et seq.*, never provided financial statements to the Creditors or any other party, and never sought qualified, disinterested professional advice with respect to the operation of the Debtor.  (*Id.*)  The Principals operated the Debtor in complete secrecy, intentionally establishing among the Creditors a belief that the Principals could obtain exceptional and consistent returns safely through superior knowledge of the real estate development, investment, and construction businesses.  (*Id.*)

The Principals owed the fundamental duty of loyalty to the Debtor, which required, among other things, that the Principals not engage in self-dealing or otherwise use their position with the Debtor to further personal interests other than those of the Debtor, and that the Principals act with the highest degree of honesty and loyalty toward the Debtor and in the best interests of the Debtor.  (*Id.* ¶ 5.)  The Principals breached this duty when they took ownership

interests in the Debtor's borrowers and used the Debtor's borrowed funds to make high-risk investments in their own projects. (*Id.* ¶ 6.) When they invested the Debtor's money, the Principals did not protect the Debtor's loan "with even so much as a promissory note," never personally guaranteed any insider borrowers' obligations to the Debtor, and, in all but one instance, never gave the Debtor a mortgage or security interest in their projects to protect the Debtor's claim. (*Id.* ¶ 7.) The Principals often gave themselves full credit for the Debtor's money by crediting their own personal capital accounts in the borrowers with the Debtor's loan and investments. (*Id.*)

The Principals operated the Debtor in a constant state of insolvency. (*Id.* ¶ 8.) More specifically, the Principals always disbursed more money to themselves than the Debtor made in profits. (*Id.*) In total, the Principals paid themselves over $4.2 million in four years. (*Id.*) The Principals were able to keep the insolvent Debtor afloat as long as they were able to make monthly interest payments to the Creditors. (*Id.*) In 2008, the real estate market collapsed, and most of the Principals' projects (and consequently, the Debtor's loans) were in default and required significant restructuring. (*Id.* ¶ 9.) Moreover, many of the Creditors had their own financial constraints and were unable to loan additional money to the Debtor. (*Id.*) By the summer of 2008, the Principals were aware that the Debtor's collapse was imminent, but, rather than act accordingly, the Principals continued to operate the Debtor, borrow more money from unknowing creditors, throw resources into failing projects, pull as much money out of the Debtor as they could, and in many instances, "just outright steal from the Debtor." (*Id.* ¶ 10.) The Complaint details this collapse. (*See generally id.*)

Every creditor of the Debtor that is not related to one of the Principals claims to have been defrauded by the Principals and to have loaned money to the Debtor relying on the misrepresentation of the Principals that the Debtor's investments were safe and secure.  (*Id.* ¶ 11.)  Based on these claimed circumstances and acts, the alleged facts of which are described in more detail throughout the 1,304 paragraphs of the Complaint, Plaintiff brings the following causes of action against Defendants:  (1) Breach of Fiduciary Duties and Corporate Waste against Klein, Dorfman, and Magee ("Count One"), (Compl. ¶¶ 333–523); (2) Turnover of Property of the Estate, in violation of 11 U.S.C. §§ 542(a)–(b), against Klein, Magee, Bashert, Rose Glasses, and Jerry's ("Count Two"), (*id.* ¶¶ 524–43); (3) Fraudulent Conveyance, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550, against all Defendants ("Count Three"), (*id.* ¶¶ 544–629); (4) Fraudulent Conveyance, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550, against all Defendants but SF Properties and the Dorfman Firm ("Count Four"), (*id.* ¶¶ 630–718); (5) Fraudulent Conveyance by Insolvent, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debt. & Cred. Law § 273, against all Defendants ("Count Five"), (*id.* ¶¶ 719–840); (6) Fraudulent Conveyance by One Engaged in Business with Unreasonably Small Capital, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debt. & Cred. Law § 274, against all Defendants ("Count Six"), (*id.* ¶¶ 841–962); (7) Fraudulent Conveyance by One Incurring Debts Beyond Ability to Pay, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debt. & Cred. Law § 275, against all Defendants ("Count Seven"), (*id.* ¶¶ 963–1084); (8) Conveyance Made with Intent to Defraud, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y. Debt. & Cred. Law § 276, against all Defendants ("Count Eight"), (*id.* ¶¶ 1085–1205); (9) Attorneys' Fees for Avoidance of Conveyance Made with Intent to Defraud, pursuant to 11 U.S.C. §§ 544(b) and 550, and N.Y.

7

Debt. & Cred. Law § 276-a, against all Defendants ("Count Nine"), (*id.* ¶¶ 1206–08); (10) Preferential Transfer, pursuant to 11 U.S.C. §§ 547(b) and 550, against Melissa ("Count Ten"), (*id.* ¶¶ 1209–21); (11) Conversion against Magee ("Count Eleven"), (*id.* ¶¶ 1222–29); (12) Accounting Malpractice and Professional Negligence against Klein and the FKF Firm ("Count Twelve"), (*id.* ¶¶ 1230–42); (13) Legal Malpractice and Professional Negligence against Dorfman and the Dorfman Firm ("Count Thirteen"), (*id.* ¶¶ 1243–56); (14) Contribution under N.Y. CPLR §§ 1401 and 1402, against Klein, Dorfman, Magee, the FKF Firm, and the Dorfman Firm ("Count Fourteen"), (*id.* ¶¶ 1257–65); (15) Aiding and Abetting Breach of Fiduciary Duties, against Magee, Klein, Dorfman, the FKF Firm, and the Dorfman Firm ("Count Fifteen"), (*id.* ¶¶ 1266–1271); (16) Objection to Claim under 11 U.S.C. § 502(d), against Magee, Klein, Dorfman, Commercial Construction, FKF V Holding, JDJ Holding, Melissa, Patrice, and Jonathan ("Count Sixteen"), (*id.* ¶¶ 1272–88); (17) Equitable Subordination of Claims under 11 U.S.C. § 510(b), against Magee, Klein, Dorfman, Patrice, Melissa, Jonathan, Commercial Construction, FKF V Holding, and JDJ Holding ("Count Seventeen"), (*id.* ¶¶ 1289–92); and (18) Re-Characterization of Claims from Debt to Equity against Magee, Klein, Dorfman, Commercial Construction, FKF V Holding, and JDJ Holding ("Count Eighteen"), (*id.* ¶¶ 1293–1304). In the Amended Complaint, Plaintiff additionally alleges an alter-ego theory of liability against Magee, Klein, and Dorfman ("Count Nineteen"), (Am. Compl. ¶¶ 1305–29), and a spoliation claim against Magee ("Count Twenty"), (*id.* ¶¶ 1330–51). Plaintiff seeks an award of actual damages against the Principals on account of the Principals' breaches of their fiduciary duties in an amount not less than $75 million, punitive damages, recovery of over $50 million in fraudulent transfers made directly and indirectly to the Principals and their various family members and

companies, and damages against the FKF Firm and Dorfman Firm for malpractice, professional negligence, breach of fiduciary duties, and for contributing to the Principals' tortious conduct. (Compl. ¶¶ 12–13.)

B.  Procedural History

Magee initially filed a Motion to Withdraw the Reference to the Bankruptcy Court on January 12, 2012 (the "First Motion to Withdraw"), which was dismissed without prejudice to renewal on May 7, 2013.  (Mem. of Law in Supp. of Renewed Mot. to Withdraw the Reference ("Def.'s Mem.") 2 (Dkt. No. 1).)  After the First Motion to Withdraw was filed, pretrial proceedings continued in the Bankruptcy Court, and discovery closed on June 28, 2013.  (*Id.* at 3.)  Magee subsequently filed the instant Motion on May 29, 2013, (Dkt. Nos. 1–2), which Plaintiff opposes, (Dkt. No. 4).  Magee filed his reply on June 28, 2013.  (Dkt. No. 5.)  The Court heard oral argument on January 22, 2016.  (*See* Dkt. (minute entry for Jan. 22, 2016).)  Shortly thereafter, the Parties filed supplemental briefing on issues identified at oral argument.  (*See* Dkt. Nos. 8, 10.)

II.  Discussion

A.  Legal Standard

1.  Jurisdiction and Adjudicative Power of the Bankruptcy Court

With certain exceptions not relevant here, district courts have original jurisdiction over all civil proceedings "arising under" or "related to" title 11.  *See* 28 U.S.C. § 1334(b).  Pursuant to 28 U.S.C. § 157, district courts may refer "all cases under title 11 and all core proceedings arising under title 11" to the district's bankruptcy court.  *Id.* § 157(b)(1).  Section 157(b)(2) provides a non-exclusive list of proceedings designated as "core."  *Id.* § 157(b)(2).  Until

recently, the bankruptcy court's role depended on whether the proceeding was "core" or "non-core."  With respect to core proceedings, the bankruptcy court could issue a final determination, but with respect to non-core proceedings, it was permitted only, in the absence of the consent of the parties, to "submit proposed findings of fact and conclusions of law to the district court," which were then subject to de novo review in the district court.  28 U.S.C. § 157(c); *see also Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 189–91 (2d Cir. 2003) (explaining the role of bankruptcy courts in core and non-core proceedings).

In *Stern v. Marshall*, 564 U.S. 462 (2011), the Supreme Court altered this framework by holding that the constitutional grant of judicial power to Article III courts, not the statutory designation of "core" or "non-core," determines whether a bankruptcy judge may issue a final determination.  *Id.* at 482–87; *see also Adelphia Recovery Tr. v. FLP Grp., Inc.*, No. 11-CV-6847, 2012 WL 264180, at *2 (S.D.N.Y. Jan. 30, 2012) (explaining *Stern*'s holding that "Congress's delineation of core matters in section 1572(b)(2) overstepped constitutional boundaries . . . when it allowed bankruptcy courts 'to enter a final judgment on a state law counterclaim'" (quoting *Stern*, 564 U.S. at 503)); *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 464 (S.D.N.Y. 2011) (noting that after *Stern*, "identifying a claim as 'core' or 'non-core' under the bankruptcy law does not necessarily determine whether a bankruptcy court is constitutionally empowered to finally adjudicate the matter").  In holding that Article III did not permit a bankruptcy court to finally adjudicate the state law counterclaim at issue in *Stern*, the Supreme Court considered:  (1) whether the counterclaim involved a public or private right; (2) whether the process of adjudicating the creditor's proof of claim would resolve the counterclaim; and (3) whether the parties consented to final adjudication by the

bankruptcy court.  564 U.S. at 478–82, 488–99; *see also In re Lehman Bros. Holdings Inc.*, 532

B.R. 203, 209 (S.D.N.Y. 2015) (same); *Residential Funding Co., LLC v. UBS Real Estate Sec.,*

*Inc.*, No. 14-CV-3039, 2015 WL 1062264, at *3 (S.D.N.Y. Mar. 6, 2015) (same); *cf. In re Arbco*

*Capital Mgmt, LLP*, 479 B.R. 254, 262 (S.D.N.Y. 2012) (explaining that "the [c]ourt

consider[ed] the three factors emphasized in *Stern*:  1) whether the defendant filed a proof of

claim in the bankruptcy proceeding, 2) whether the right is public or private, and 3) whether the

parties consented to have the bankruptcy court enter final judgment").

### 2.  Withdrawal of Bankruptcy Reference

Pursuant to 28 U.S.C. § 157(d), a "district court may withdraw, in whole or in part, any

case or proceeding referred under this section . . . for cause shown."  Prior to *Stern*, the Second

Circuit held in *In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993), that cause for withdrawal

should be evaluated based on five factors:  "whether the claim or proceeding is core or non-core,

whether it is legal or equitable, and considerations of efficiency, prevention of forum shopping,

and uniformity in the administration of bankruptcy law."  *Id.* at 1101.  The *Orion* Court

emphasized that "[a] district court considering whether to withdraw the reference should first

evaluate whether the claim is core or non-core, since it is upon this issue that questions of

efficiency and uniformity will turn."  *Id.* (italics omitted).  The *Orion* court further reasoned that

"the fact that a bankruptcy court's determination on non-core matters is subject to de novo

review by the district court could lead the latter to conclude that in a given case unnecessary

costs could be avoided by a single proceeding in the district court."  *Id.*  "Conversely, hearing

core matters in a district court could be an inefficient allocation of judicial resources given that

11

the bankruptcy court will be more familiar with the facts and issues." *Id.*  As relevant here,

"[t]he threshold core/non-core evaluation also determines the relevance of the parties' jury trial

rights to deciding a motion to withdraw the reference." *Id.*  While the "bankruptcy court has the

power to hold jury trials in core proceedings," jury trials in bankruptcy courts in non-core

proceedings are likely prohibited "due to the district court's de novo review of such

proceedings." *Id.* (italics omitted); *see also Lehman Bros. Holdings Inc. v. Wellmont Health

Sys.*, No. 14-CV-1083, 2014 WL 3583089, at *5 (S.D.N.Y. July 18, 2014) (same).  "If a case is

non-core and a jury demand has been filed, a district court might find that the inability of the

bankruptcy court to hold the trial constitutes cause to withdraw the reference[,] [or] . . . . a

district court also might decide that a case is unlikely to reach trial, that it will require protracted

discovery and court oversight before trial, or that the jury demand is without merit, and therefore

might conclude that the case at that time is best left in the bankruptcy court." *Orion*, 4 F.3d at

1101–02.  "While the core/non-core determination is an important factor, courts have repeatedly

emphasized that this factor is not dispositive of a motion to withdraw a reference." *In re

Northeast Indus. Dev. Corp.*, 511 B.R. 51, 53 (S.D.N.Y. 2014) (collecting cases); *see also In re

Lehman Bros. Holdings Inc.*, 18 F. Supp. 3d 553, 557 (S.D.N.Y. 2014) (same).  Rather, the

Second Circuit has explained that "once a district court makes the core/non-core determination, it

should weigh questions of efficient use of judicial resources, delay[,] and costs to the parties,

uniformity of bankruptcy administration, the prevention of forum shopping, and other related

factors." *Orion*, 4 F.3d at 1101; *see also In re Northeast Indus. Dev. Corp.*, 511 B.R. at 53

(same).

Following the Supreme Court's holding in *Stern*, courts in this district have taken different approaches in adapting the *Orion* factors to *Stern*'s holding.  *See In re Lehman Bros. Holdings Inc.*, 532 B.R. at 210 (explaining that "[c]ourts in this district vary in their interpretation of how *Stern* affects application of the *Orion* factors when ruling on a motion to withdraw the reference").  Some courts have modified the first prong of *Orion* (whether a proceeding is core or non-core) and considered whether the bankruptcy court has constitutional authority to finally adjudicate the matter under *Stern*.  *See id.* at 210 (collecting cases); *In re Connie's Trading Corp.*, No. 12-CV-376, 2014 WL 1813751, at *7 (S.D.N.Y. May 8, 2014) (explaining that "in resolving the motion for permissive withdrawal, [the court would] first address whether the bankruptcy court has final adjudicative authority over the adversary proceeding under *Stern* before discussing the relevant *Orion* factors"); *In re Arbco Capital Mgmt., LLP*, 479 B.R. at 262 ("This Court concludes, as have others in this district, that the relevant inquiry under the first prong of the *Orion* test is not whether a matter is core or non-core, but whether the bankruptcy court has the authority to finally adjudicate the matter."); *In re Lyondell Chem. Co.*, 467 B.R. 712, 719 (S.D.N.Y. 2012) ("Under *Stern*, it is not the core/non-core distinction but Article III that determines the bankruptcy court's adjudicative authority. Thus, a district court . . . must first determine whether or not the bankruptcy court has constitutional authority to enter final judgment on the claim . . . .  To the extent the core/non-core distinction held a privileged position among the *Orion* factors before *Stern*, this is no longer the case."); *In re Levine*, No. 11-CV-9101, 2012 WL 310944, at *2–3 (S.D.N.Y. Feb. 1, 2012) (applying *Stern*'s public rights doctrine to the core/non-core *Orion* factor); *Dev. Specialists, Inc.*,

13

462 B.R. at 471–72 (modifying *Orion*'s core/non-core factor to account for final adjudicative

authority as determined by *Stern*); *see also Picard v. Avellino*, 469 B.R. 408, 413 n.3 (S.D.N.Y.

2012) (acknowledging *Stern*'s impact on the analysis of judicial efficiency set out in the *Orion*

factors).

      A second approach retains the original *Orion* factors and adds *Stern*'s evaluation of the

bankruptcy court's constitutional authority to make a final determination as a separate inquiry.

*See In re Lehman Bros. Holdings Inc.*, 532 B.R. at 210 (collecting cases); *Adelphia Recovery*

*Trust*, 2012 WL 264180, at *3 ("After *Stern*, a court's consideration of a motion to withdraw

reference to bankruptcy court should—in addition to the *Orion* factors—include consideration

of:  whether the claims at issue involve a public or private right; whether the claims will be

resolved in ruling on a creditor's proof of claim, if any; and whether the parties consent to final

adjudication by a non-Article III tribunal."); *see also Madison Bentley Assocs. v. Bentley*

*Manhattan Inc., LLC*, 474 B.R. 430, 435 (S.D.N.Y. 2012) (same).

      Finally, some district courts have continued to apply the *Orion* test as originally

conceived with no modification in light of the *Stern* holding.  *See In re Lehman Bros. Holdings*

*Inc.*, 532 B.R. at 210 (collecting cases); *Extended Stay, Inc. v. Blackstone Grp.*, 466 B.R. 188,

204 (S.D.N.Y. 2011) ("As an initial matter, there is nothing in *Stern* to suggest that the statutory

distinction between core claims and non-core claims is an inappropriate consideration when

analyzing permissive withdrawal under [§] 157(d)."); *see also In re Coudert Bros.*, No. 11-CV-

4949, 2011 WL 7678683, at *3–5 (S.D.N.Y. Sept. 23, 2011) (granting motion to withdraw the

reference with respect to non-core claims).  In a previous decision, this Court concluded "that the

first of the *Orion* factors, originally the statutory core/non-core distinction, should include the question of whether the bankruptcy court has constitutional authority to enter a final decision under *Stern*."  *Dynergy Danskammer, L.L.C. v. Peabody COALTRADE Int'l Ltd.*, 905 F. Supp. 2d 526, 530 (S.D.N.Y. 2012) (explaining the Court's reasoning in joining "the other courts that have applied a modified analysis of the core/non-core factor under *Orion* to account for the Article III requirements and exceptions articulated in *Stern*.").  In other words, the Court applied the first approach, described above, and will also do so for the purpose of resolving the instant Motion.

B.  Analysis

The Court now considers each of the five *Orion* factors, as modified by *Stern*:  whether the bankruptcy court has final adjudicative authority over the claim; whether the claim is legal or equitable; and considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law.

1. The Bankruptcy Court's Final Adjudicative Authority

As discussed above, the first inquiry is whether the bankruptcy court has final adjudicative authority over the claims at issue under *Stern*'s constitutional analysis.  *See In re Connie's Trading Corp.*, 2014 WL 1813751, at *7 (explaining that "after *Stern*, most courts hold that the first inquiry is whether the bankruptcy court has final adjudicative authority over the claim" and, therefore, "in resolving the motion for permissive withdrawal, [the court would] first address whether the bankruptcy court [had] final adjudicative authority over the adversary proceeding under *Stern* before discussing the relevant *Orion* factors" (internal quotation marks

15

omitted)).  The *Stern* Court explained that Article III protects liberty "through its role in implementing the separation of powers" and "by specifying the defining characteristics of Article III judges."  564 U.S. at 483.  Therefore, "in general, Congress may not 'withdraw from [Article III] judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'"  *Id.* at 484 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)).  Consistent with this principle, the Supreme Court set forth three instances where a bankruptcy court may adjudicate finally a claim at issue:  (1) if the claim involves a public right; (2) if the process of adjudicating the creditor's proof of claim would necessarily resolve a counterclaim; or (3) if the parties consent to final adjudication by the bankruptcy court.  *See id.* at 478–82, 488–99; *accord In re Lyondell Chem. Co.*, 467 B.R. at 720 (applying these three considerations in deciding motion to withdraw bankruptcy reference).

In support of the instant Motion, Magee argues that the Adversary Proceeding "primarily raises non-core, common law claims," and that "[t]he Bankruptcy Court does not have power to finally determine those common-law claims, even though Magee has filed claims in the bankruptcy case."  (Renewed Mot. To Withdraw the Reference ("Mot.") ¶ 3 (Dkt. No. 1).)  In contrast, the Trustee contends that although it is undisputed that Magee has timely asserted jury trial rights and withheld his consent to holding a jury trial in the Bankruptcy Court, the Bankruptcy Court has the power to enter a final judgment on all of the claims in the Adversary Proceeding because Magee has "relinquished any extant Article III or jury trial rights by filing proofs of claim," and the claims in the Adversary Proceeding derive exclusively from the Bankruptcy Code, are claims that invoke 11 U.S.C. § 502(d), and/or are claims that will

16

necessarily be decided as part of the claims-allowance process.  (Mem. of Law of Pl. in Opp'n to Mot. for an Order Withdrawing the Reference ("Pl.'s Opp'n") 9–19 (Dkt. No. 4).)  The Court considers these arguments in light of *Stern* as to each type of claim that the Trustee asserts against Magee.

<u>a.  Counts One, Fourteen, Fifteen, and Nineteen</u>

Count One for Breach of Fiduciary Duty and Corporate Waste, (Compl. ¶¶ 333–523), Count Fourteen for Contribution under N.Y. CPLR §§ 1401 and 1402, (*id.* ¶¶ 1257–65), Count Fifteen for Aiding and Abetting Breach of Fiduciary Duties, (*id.* ¶¶ 1266–71), and Count Nineteen for Alter-Ego, (Am. Compl. ¶¶ 1305–09), are state common law causes of action that, absent other circumstances, do not qualify as public rights over which the Bankruptcy Court has final adjudicative authority, *see In re Arbco Capital Mgmt., LLP*, 479 B.R. at 263, 266 (holding that "the four state common law claims (aiding and abetting a fraud, breach of fiduciary duty, breach of contract and negligence)" "involve non-core proceedings and are indisputably private rights"); *cf. Goodkin v. United States*, 773 F.2d 19, 23 (2d Cir. 1985) (explaining that "[t]he law of contribution in New York has both common law and [state law] statutory roots" (citations omitted)).  The Trustee concedes as much. (*See* Pl.'s Opp'n Ex. B (noting that all four counts have "Article III [d]etermination [r]ights [g]enerally").)

Nevertheless, the Trustee argues that by filing Claim 52, which "asserts in the Bankruptcy Court myriad common-law equitable and legal claims against the estate and other Principals of the Debtor, alleging, inter alia, direct and derivative claims for breach of fiduciary duties, mismanagement, gross negligence, and breach of an operating agreement," and Claim 38,

17

that Magee has "made resolution of the Trustee's claims integral to the restructuring of the debtor-creditor relationship," and the Bankruptcy Court thus has the authority to enter final judgment as to these otherwise common law claims.  (Pl.'s Opp'n 17 (italics and internal quotation marks omitted).)  The Supreme Court in *Stern*, however, made clear that the relevant inquiry "is whether the action at issue stems from the bankruptcy itself *or would necessarily be resolved in the claims allowance process*."  *Stern*, 564 U.S. at 499 (emphasis added).  In other words, the fact that Magee has filed proofs of claim is relevant, but not sufficient, in determining whether the Bankruptcy Court is constitutionally permitted to enter a final judgment as to these claims.  *Cf. In re CBI Holding Co.*, 529 F.3d 432, 466 (2d Cir. 2008) (explaining that "filing a proof of claim is a necessary but not sufficient condition to forfeiting a creditor's right to a jury trial").  Rather, the Court must analyze whether, in deciding Magee's proofs of claim, the Bankruptcy Court would necessarily resolve the claims in the Adversary Proceeding.  *See Picard v. Estate of Madoff*, 464 B.R. 578, 586 (S.D.N.Y. 2011) ("Under *Stern*, the bankruptcy court retains authority to determine all of the [t]rustee's common law claims to the extent that it must do so to determine the allowance or disallowance of [the creditors'] proof of claim."); *In re Salander O'Reilly Galleries*, 453 B.R. 106, 118 (Bankr. S.D.N.Y. 2011) (explaining that "it is clear" from *Stern* "that the Bankruptcy Court is empowered to apply state law when doing so would finally resolve a claim"), *aff'd*, 475 B.R. 9 (S.D.N.Y. 2012).

Claim 52, in which Magee sought damages from the Debtor in excess of $30 million, is no longer pending for resolution before the Bankruptcy Court.  Instead, the Bankruptcy Court expunged Claim 52 by order dated July 6, 2012.  (Pinsky Aff. Exs. 7–8.)  The Court notes that

there was overlap between the issues that Claim 52 presented and the issues implicated in the Trustee's counterclaims against Magee.  Indeed, as the Trustee points out, Claim 52 alleged or otherwise implicated issues relating to "direct and derivative claims for breach of fiduciary duties, mismanagement, gross negligence, and breach of an operating agreement."  (Pl.'s Opp'n 17.)  Accordingly, this is not a case where the proof of claim submitted by the relevant creditor was markedly different from the issues raised in the debtor's counterclaims against that creditor. *Cf. Residential Funding Co.*, 2015 WL 1062264, at *4 (holding that the bankruptcy court lacked the constitutional authority to issue a final judgment in the relevant core proceeding because, among other things, "[t]he [b]ankruptcy [c]ourt w[ould] not completely dispose of the counterclaims when it adjudicate[d] [the movant's] proof of claim," as the "claims in [the] action and the [relevant proof of claim] [were] based on wholly distinct contracts, involving entirely different sets of loans" (internal quotation marks omitted)); *ResCap Liquidating Tr. v. PHH Mortg. Corp.*, 518 B.R. 259, 265 (S.D.N.Y. 2014) (holding that the bankruptcy court did not have final adjudicative authority where "the bankruptcy court w[ould] not dispose of the counterclaims when it adjudicate[d] [the] proof of claim" because "[t]he proof of claim [arose] from post-petition contracts, while the counterclaims [were] based on unrelated pre-petition agreements").

Nonetheless, while Claim 52 and many of the claims in the Adversary Proceeding were based on similar facts, Claim 52 has been expunged on the motion of the Trustee, and the Bankruptcy Court's order expunging this claim plainly did not fully resolve the counterclaims the Trustee asserts here.  Moreover, there is no longer any possibility that in resolving Claim 52

the Bankruptcy Court will necessarily resolve these counterclaims.  In other words, timing

matters—while it may have been premature to decide that the Bankruptcy Court would not

necessarily resolve the Trustee's state law counterclaims while Claim 52 was pending, *see*

*Picard*, 464 B.R. at 586 (declining to withdraw the reference to the bankruptcy court where "the

[t]rustee's common law claims might still be resolved as part of the allowance or disallowance of

[the movants'] proof of claims, and it would be premature to insist that the common law claims

be litigated in an Article III court" (internal quotation marks omitted)), now that Claim 52 is

expunged, the facts at issue in this Adversary Proceeding will not be necessarily resolved by the

Bankruptcy Court.  Accordingly, because the Bankruptcy Court's resolution of Claim 52 did not

resolve, let alone fully resolve the state law counterclaims at issue here, Magee's filing of Claim

52 does not give the Bankruptcy Court the power to enter final judgment on these counterclaims.

*See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 455 (Bankr.

S.D.N.Y. 2015) ("The Court's authority to enter a final judgment depends, therefore, on whether

a particular defendant filed a claim that *is still subject to* allowance or disallowance through the

claims allowance process." (emphasis added)); *id.* ("[N]o § 502(d) disallowance claim would lie

against a defendant who filed a claim that has been finally disallowed."); *Dynegy Danskammer*,

905 F. Supp. 2d at 532 (holding that the bankruptcy court lacked final adjudicative authority over

the relevant claim, because, among other things, "the primary facts at issue in the breach of

contract claim . . . [would] not be resolved by the bankruptcy court's adjudication of [the

estate's] title 11 petition"); *Picard*, 464 B.R. at 586 (explaining that under *Stern*, "because the

bankruptcy court's resolution of the creditor's proof of claim for defamation did not fully resolve

[the] tortious interference counterclaim, Congress could not bypass Article III and vest the bankruptcy court with the power to enter a final judgment on that counterclaim"); *cf. Stern*, 564 U.S. at 503 ("The [b]ankruptcy [c]ourt lacked the constitutional authority to enter a final judgment on a state law counterclaim that *is not resolved* in the process of ruling on a creditor's proof of claim." (emphasis added)).[3]

---

[3] To the extent the Trustee relies on pre-*Stern* cases for the proposition that "the fact that [Claim 52] was expunged does not reverse the effects of having filed it," the Court does not find these cases persuasive. (*See* Pl.'s Opp'n 16 n.13 (citing, inter alia, *In re WorldCom, Inc.*, 378 B.R. 745, 754–56 (Bankr. S.D.N.Y. 2007); *In re Enron Corp.*, 349 B.R. 108, 114 n.2 (Bankr. S.D.N.Y. 2006)).) *Stern* suggests that the relevance of filing a proof of claim to the Article III analysis is limited by its practical implications for the claims resolution process. In particular, the justification for the "necessarily resolved" rule is practical: where a Trustee's counterclaims are resolved by the bankruptcy court in the process of adjudicating a creditor's proof of claim, the creditor has "no basis" for demanding a second adjudication of those claims in an Article III court. *Stern*, 564 U.S. at 496; *see also id.* (distinguishing *Katchen v. Landy*, 382 U.S. 323 (1966), on the ground that "[o]nce the [bankruptcy] referee [ruled on the Trustee's voidable preference issue in order to adjudicate the creditor's proof of claim], nothing remain[ed] for adjudication in a plenary suit; such a suit would be a meaningless gesture" (internal quotations omitted)); *id.* at 503 ("The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."); *cf.* Ralph Brubaker, *A "Summary" Statutory & Constitutional Theory of Bankruptcy Judges' Core Jurisdiction after Stern v. Marshall*, 86 Am. Bankr. L.J. 121, 177–78 (2012) (noting that the question of whether "final adjudication of a nonbankruptcy state-law counterclaim is properly within a non-Article III bankruptcy judge's core jurisdiction" will often "depend upon the precise positions of the parties and the evidence presented" and that the bankruptcy judge "should be able to let the actual evidence presented and the ultimate decisional needs of the particular case at issue dictate the full extent of his/her adjudicatory authority over state-law counterclaims").

Moreover, in *Katchen*, the Supreme Court explained that its decision was "governed by the traditional bankruptcy law that he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide by *the consequences of that procedure*," and that, accordingly, the Court was not addressing a "demand by the trustee for affirmative relief, all of the substantial factual and legal bases for which *have not been disposed of in passing on objections to the claim*." *Id.* at 332 n.9 (emphasis added) (internal quotation marks omitted). Here, "all of the substantial factual and legal bases" of the Trustee's claims "have not been disposed of in passing on objections to . . . [C]laim [52]" (and no longer can be). While Magee

Even if the disallowance of Claim 52 was ignored, the Court still finds that the relationship between Claim 52 and Counts One, Fourteen, Fifteen, and Nineteen is insufficient to satisfy *Stern*'s requirement that the counterclaims be necessarily resolved by the creditor's proof of claim.  Though there was overlap between the issues that Claim 52 presented and the issues implicated in the Trustee's relevant counterclaims against Magee, *some* overlap of issues between a proof of claim and a Trustee's counterclaims is not sufficient to provide the bankruptcy court with final adjudicative authority over the Trustee's common law claims; rather, the claims must *necessarily be resolved* in the claims allowance process.  *See Stern*, 564 U.S. at 497 (explaining that if the bankruptcy court makes "factual and legal determinations that [are] not disposed of in passing on objections to [the] proof of claim," its exercise of final adjudicative authority over the counterclaim is unconstitutional (internal quotation marks omitted)); *In re Lehman Bros. Holdings Inc.*, 480 B.R. 179, 191 (S.D.N.Y. 2012) ("[E]ven assuming that there is some overlap between [the] plaintiffs' liability theories and [the creditor's] right to recover from the estate, [the] [p]laintiffs' damages claim will not 'be *completely* resolved in the bankruptcy process of allowing or disallowing [the creditor's] claims.'" (quoting *Stern*, 564 U.S. at 487)); *accord In re Emerald Casino, Inc.*, 467 B.R. 128, 132–33 (N.D. Ill. 2012) (holding that, despite acknowledgement that some factual issues related to trustee's counterclaims will be decided as part of the claims resolution process, "[such] overlap may not be enough to escape the *Stern* holding").

---

must "abide by the consequences of the procedures" used to resolve Claim 52, those consequences, as it so happened, had no effect on the claims asserted by the Trustee against Magee.

The Trustee has not "demonstrate[d] that each factual and legal element of [these] claim[s] will be decided in the claims allowance process such that after the process 'nothing remains for adjudication in a plenary suit.'" *In re Lehman Bros Holdings Inc.*, 480 B.R. at 190 (quoting *Stern*, 564 U.S. at 496).  As relevant to Counts One and Fifteen, under New York law, a "counterclaim for breach of fiduciary duty involves three elements:  '(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.'" *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 441 (S.D.N.Y. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011)).  In turn, "a claim of aiding and abetting breach of fiduciary duty has three elements:  (1) the existence of a breach of fiduciary obligations, of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) the plaintiff suffered damages as a result of the breach." *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 613 (S.D.N.Y. 2011) (citing *In re Sharp Int'l Corp.*, 403 F.3d 43, 49–50 (2d Cir. 2005)).  Relevant to Count Fourteen, "[u]nder New York law, a contribution claim arises among 'two or more persons who are subject to liability for damages for the same . . . injury to property.'" *SPV OSUS Ltd. v. UBS AG*, No. 15-CV-619, 2015 WL 4079079, at *2 (S.D.N.Y. July 1, 2015) (second alteration in original) (quoting N.Y. C.P.L.R. § 1401).  Finally, as to Count Nineteen, "New York law allows the corporate veil to be pierced either when there is fraud or when the corporation has been used as an alter ego." *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir. 1990) (emphasis omitted).  "The latter normally requires 'a showing of . . . complete control by the dominating corporation that leads to a wrong against third parties.'" *Int'l Equity*

*Inv., Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007) (alteration in original) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991)).

Claim 52 appears to have been addressed specifically to the actions of the Debtor "through its Managing Member, Mitchell Klein," (*see* Claim 52 at unnumbered 4), and not Magee.  The Trustee does not explain how resolution of that claim would resolve critical issues underlying Counts One, Fourteen, Fifteen, and Nineteen *against Magee*, such as what fiduciary duties *Magee* owed the Debtor, whether *Magee* engaged in the fraudulent financial transactions and other activities alleged by the Trustee, *Magee's* responsibility or fault for damages relative to other Principals of the Debtor, or whether *Magee* exercised sufficient control over the Debtor to determine the Debtor was merely Magee's alter-ego.  Because "there was never any reason to believe that the process of adjudicating [Claim 52] would necessarily resolve [Plaintiff's common law] counterclaim[s]" against Magee, the Bankruptcy Court does not have constitutional authority to adjudicate those counterclaims.  *Stern*, 564 U.S. at 497.

Magee also filed Claim 38, seeking $609,448.46 for money loaned pursuant to an alleged promissory note.  Unlike Claim 52, Claim 38 has not been expunged and is pending for resolution before the Bankruptcy Court.  As discussed, the Court must assess whether "each factual and legal element of [the Trustee's] various [state common law] claims will be . . . resolved" by Claim 38.  *In re Lehman Bros. Holdings Inc.*, 480 B.R. at 190 (internal quotation marks omitted).  The Complaint alleges that on November 18, 2010, Magee filed Claim 38 "on account of Magee's 'loan account' with the Debtor."  (Compl. ¶ 306.)  The Trustee

24

claims that "[a]n examination of the Magee loan account reveals that it was used more like a personal piggy bank and means of receiving unwarranted compensation from the Debtor in the form of interest."  (*Id.* ¶ 307.)  According to the Trustee, "the Debtor only received $772,658.50 from Magee on account of his loan account," and, "[i]n exchange for the $772,658.50 in cash received by the Debtor, Magee received significant transfers back, including, among others: $700,000 to his company, Commercial Construction; $310,000 to the United States Treasury on account of his personal income taxes; $65,000 to New York State; $38,858.86 to American Express; and $440,861.62 in interest payments.  (*Id.* ¶¶ 307–08.)  Magee argues that resolution of Claim 38 will require a court to determine "(i) proof of money loaned; and (ii) proof of the existence of any avoidable transfers."  (Def.'s Mem. 19.)  Although the Trustee spends a considerable amount of time explaining the effect of Claim 52 on the state common law claims, he does not address the effect of Claim 38 on the state common law claims or otherwise respond to Magee's representation of what resolution of Claim 38 will entail.  In any event, as with Claim 52, the Court is not convinced that a decision on whether to allow or disallow Claim 38 will fully resolve the state common law claims.  For example, there is no reason to conclude that a determination of proof of money loaned by Magee would somehow require the Bankruptcy Court to adjudicate the extent of the fiduciary duties owed by Magee to Debtor, the relative fault or responsibility Magee possesses for the Debtor's losses relative to the other Principals, or the extent to which the Debtor was merely Magee's alter-ego.

Accordingly, in the absence of any indication that resolving these claims is necessary to rule on Magee's proofs of claim, *see In re Lehman Bros. Holdings Inc.*, 480 B.R. at 190

(explaining that the court was "unconvinced that each factual and legal element of [the] [p]laintiffs' various claims would be . . . resolved" "in order to rule on [the creditor's] proof of claim" (internal quotation marks omitted)), which, as discussed above, there is not, Count One, Count Fourteen, Count Fifteen, and Count Nineteen are private rights and the Bankruptcy Court does not have final adjudicative authority over these claims.[4]

### b.  Counts Two Through Nine and Count Sixteen

The causes of action in Counts Two through Nine are based on federal bankruptcy law, and seek return of Debtor's property currently under Magee's control, (*see* Compl. ¶¶ 528–32),

---

[4] The Supreme Court has recently reaffirmed that parties can consent to final adjudication by a bankruptcy court, even when the claims at issue are so-called "*Stern*" claims," over which the bankruptcy court would otherwise lack constitutional authority to finally adjudicate.  *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1942 (2015).  Here, the Trustee argues that Magee has consented to a final adjudication of the Trustee's common law claims by the Bankruptcy Court because he filed two proofs of claim and litigated those claims to a certain extent in the Bankruptcy Court.  (*See* Suppl. Mem. of Law of Pl. in Opp'n to Mot. for an Order Withdrawing the Reference ("Pl.'s Suppl. Mem.") 9–10 (Dkt. No. 8).)  However, as the Court explained in *Stern*, a creditor does not consent to final adjudication of a debtor's common law counterclaim merely by filing a proof of claim, because such a creditor "ha[s] nowhere else to go if he wishe[s] to recover from [the debtor's] estate."  *Stern*, 564 U.S. at 493 (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59 n.14 (1989)).

While Magee's filing of the proofs of claim, and, as pointed out by the Trustee, failure to contest the Bankruptcy Court's authority to disallow Claim 52, (*see* Pl.'s Suppl. Mem. 10), could amount to consent as to the Bankruptcy Court's authority to issue a final judgment as to his proofs of claim, *see Stern*, 564 U.S. at 480–81, such actions do not amount to consent as to final adjudication as to the Trustee's common law claims, *see id.* at 493, especially where Magee's amended answer demanded a jury trial and raised the Court's lack of constitutional authority as an affirmative defense, (Am. Answer ¶ 1388 (Bankr. Ct. Dkt. No. 41)), and where he filed his initial motion to withdraw the reference less than two months after filing the amended answer, *see Roell v. Withrow*, 538 U.S. 580, 590 (2003) (noting that a party implicitly consents to a court's jurisdiction where "the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the [m]agistrate [j]udge").

and avoidance of various payments made to Magee based on different fraudulent conveyance theories, (*see id.* ¶¶ 544–1205).[5]  The Trustee also seeks attorneys' fees in connection with the avoidance of the fraudulent conveyances.  (*See id.* ¶¶ 1206–08.)  Count Sixteen contains an objection to Magee's proofs of claim, brought pursuant to 11 U.S.C. § 502(d).  (*Id.* ¶¶ 1272–75, 1288.)

The Trustee argues that Magee's filing of two proofs of claim triggered the claims-allowance process in 11 U.S.C. § 502 and that subsection (d) "per se disallows certain creditor claims."  (Pl.'s Opp'n 14 (italics omitted).)  "Thus, the mere act of filing a proof of claim on any grounds unconditionally submits the merits of all counterclaims listed in § 502(d) to the bankruptcy court's authority to enter Final Judgment."  (*Id.*)[6]

Section 502(d) states:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550 or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

---

[5] Because 11 U.S.C. § 544(b) allows a trustee to avoid only transfers that are "voidable under applicable law," each fraudulent transfer claim brought by the Trustee under that section is paired with a different section of New York's Debtor and Creditor Law.  (*See* Compl. 139, 154, 169, 184, 199.)

[6] Indeed, Magee appears to concede at least that the Bankruptcy Court has constitutional authority to enter final judgment on the fraudulent conveyance claims (Counts Three through Nine).  (*See* Def.'s Mem. 18 & n.8 (noting that "[a] decision by the [B]ankruptcy [C]ourt in this case to allow or disallow Magee's proof of claim for money loaned will not find the facts essential to establish or negate the Trustee's various common-law claims, *at least not those other than the fraudulent conveyance claims*," and that § 502(d) "requires the return of avoidable transfers such as fraudulent conveyances before a creditor's claim may be allowed" (emphasis added).)

11 U.S.C. § 502(d).  Because § 502(d) requires that any creditor claim *must be* disallowed if the entity filing the claim possesses property recoverable under, inter alia, § 542, or is the transferee of a transfer avoidable under, inter alia, §§ 544 or 548 (and recoverable under § 550), unless the entity has turned over the property, the causes of action in Counts Two through Nine, which are brought pursuant to §§ 542, 544, 548, and 550, would "necessarily be resolved in the claims allowance process," *Stern*, 564 U.S. at 499, and thus the Bankruptcy Court can constitutionally enter final judgment on those claims.[7]

The Supreme Court addressed a similar factual scenario in *Katchen v. Landy*, 382 U.S. 323 (1966), where a former officer of a debtor filed two claims in the debtor's bankruptcy proceeding and the trustee responded with a petition asserting that various payments the officer made from the debtor's funds before bankruptcy were voidable preferences.  *Id.* at 325.  The Court rejected the officer's argument that final adjudication of the trustee's avoidance claims by the bankruptcy court would violate his Seventh Amendment rights to a jury trial.  *Id.* at 336.[8]

---

[7] The same is true, of course, with respect to Count Sixteen of the Complaint, which is the Trustee's formal objection to claim under § 502(d), alleging that Magee received transfers of property recoverable pursuant to 11 U.S.C. §§ 544, 547, 548, and/or 550.  *See, e.g.*, *In re Settlers' Hous. Serv., Inc.*, 505 B.R. 483, 495 (N.D. Ill. 2014) (noting that "of course" it would be "necessary" for the bankruptcy court to resolve a proof of claim itself under § 502(d) (internal quotation marks omitted)).

[8] Although *Katchen* addresses Seventh Amendment jury trial rights, the same framework applies to the consideration of whether a non-Article III tribunal can finally decide a claim. Indeed, the *Stern* Court relied on *Katchen* and other cases in the Seventh Amendment context when considering whether the bankruptcy court had constitutional authority to finally adjudicate certain claims.  *See Stern*, 564 U.S. at 495–99; *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 46, 50 n.1 (S.D.N.Y. 2013) (noting that "the same framework applies to both issues").

The decision turned on the fact that the officer had filed claims in the debtor's bankruptcy proceeding:

> [A]lthough [the officer] might be entitled to a jury trial on the issue of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee, when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity.

*Id.* (citation omitted).[9]  Where a creditor files a claim, his proper share of the debtor's res "can neither be determined nor allowed until the creditor disgorges the alleged voidable preference he has already received."  *Id.*

The Supreme Court reaffirmed the principle that a creditor's filing of a proof of claim transforms certain of the trustee's otherwise legal claims related to the claim into equitable claims that a bankruptcy court could finally decide through its subsequent rulings in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), and *Langenkamp v. Culp*, 498 U.S. 42 (1990).  *See Granfinanciera*, 492 U.S. at 58 (reading *Katchen* as "holding that, under the Seventh Amendment, a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor ha[d] submitted a claim against the estate"); *Langenkamp*, 498 U.S. at 44 ("[T]he creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction*.").  Finally, the Supreme Court's decision in *Stern* does not alter the *Katchen* line of cases but does clarify exactly when a creditor's filing of a proof of claim transforms legal claims

---

[9] *Katchen* involved the "statutory predecessor" of 11 U.S.C. § 502(d), *see Sec. Inv'r Prot. Corp.*, 490 B.R. at 54, which required that a claim be disallowed when the creditor had "received or acquired preferences void or voidable under this title," *Katchen*, 382 U.S. at 330 (alteration and internal quotation marks omitted).

29

into equitable ones.  Specifically, the majority explained that the results in *Katchen* and *Langenkamp* were appropriate because "the action[s] at issue stem[med] from the bankruptcy itself or would necessarily be resolved in the claims allowance process."  *Stern*, 564 U.S. at 499.

Because the Trustee's claims in Counts Two through Nine and Sixteen "would necessarily be resolved in the claims allowance process," which was invoked by Magee, the bankruptcy court has the constitutional authority to enter final judgment on those claims.  *See In re Bernard L. Madoff Inv. Sec., LLC*, 740 F.3d 81, 95 (2d Cir. 2014) (holding that the bankruptcy court had constitutional authority to enter final judgment on trustee's fraudulent transfer claim because the defendants "filed a proof of claim" and "[i]n order to rule on that claim, the [b]ankruptcy [c]ourt was required to first resolve the fraudulent transfer issue"); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 46, 55 (S.D.N.Y. 2013) ("Thus, under *Katchen*, whenever the [b]ankruptcy [c]ourt must resolve a § 502(d) claim brought by the [t]rustee, it may also finally decide avoidance actions to the extent that those actions raise the same issues as the § 502(d) claim and thus would 'necessarily' be resolved by it."); *In re Quebecor World (USA), Inc.*, 491 B.R. 379, 384 (Bankr. S.D.N.Y. 2013) (relying on *Katchen* and *Langenkamp* to hold that, because defendant filed a proof of claim, the bankruptcy court had constitutional authority to issue a final judgment on the plaintiff's preferential transfer claims, because those "claims would necessarily be resolved in ruling on the [d]efendant's proof of claim as a result of [§] 502(d) of the Bankruptcy Code"); *In re Tronox Inc.*, 503 B.R. 239, 345 (Bankr. S.D.N.Y. 2013) (finding "there was no question that the process of adjudicating [the

creditors'] proofs of claim required resolution of [the] [p]laintiffs' fraudulent conveyance and

other claims against the [creditors]" (internal quotation marks omitted)).[10]

<u>c.  Count Eleven</u>

Count Eleven seeks a judgment against Magee of not less than $1.439 million under a

conversion theory, alleging that Magee personally collected and retained for his own personal

use debt payments owed to the Debtor.  (Compl. ¶¶ 1222–29.)  The Trustee concedes that

conversion is a common law claim that generally must be finally adjudicated by an Article III

court.  (Pl.'s Opp'n Ex. B at 2.)  The Trustee argues, however, that the conversion claim seeks

recovery of the "exact same funds" as those sought through the Trustee's turnover and fraudulent

conveyance claims, which means that the conversion claim "will necessarily be determined by

the Bankruptcy Court in connection with [the] various turnover and avoidance actions implicated

by § 502(d), and is integral to the claim-allowance process."  (Pl.'s Opp'n at 18.)  The Court

agrees.

As discussed above, Magee's filing of a proof of claim automatically triggers the claims-

allowance process and, as part of that process, § 502(d) requires resolution of the Trustee's

---

[10] The Bankruptcy Court has constitutional authority to enter final judgment on the turnover claim in Count Two for the additional reason that the claim "stems from the bankruptcy itself."  *Stern*, 564 U.S. at 499; *see also In re Pali Holdings, Inc.*, 488 B.R. 841, 848–52 (Bankr. S.D.N.Y. 2013) (finding that bankruptcy court has constitutional authority to enter final judgment on turnover claim under § 542 because it is "simply an effort to recover property . . . that is *already* property of the estate").

Additionally, the Court notes that, while Claim 38 seeks only $609,448.46, and the Trustee seeks to recover over $40 million from Magee for various fraudulent transfers, "once a creditor has filed a claim against the estate, the bankruptcy trustee may recover the full amount of any preference received by the creditor-claimant, even if that amount exceeds the amount of the creditor's claim."  *Granfinanciera*, 492 U.S. at 59 n.14.

turnover claim under § 542.  Under § 542, an entity must turn over property to the Debtor if the entity is "in possession, custody, or control" of "property that the trustee may use, sell, or lease." 11 U.S.C. § 542(a).  Under New York law, "conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Palermo v. Taccone*, 913 N.Y.S.2d 859, 863 (App. Div. 2010) (internal quotation marks omitted).  "Two key elements of conversion are (1) [the] plaintiff's possessory right or interest in the property . . . and (2) [the] defendant['s] dominion over the property or interference with it, in derogation of [the] plaintiff's rights." *Id.* (alteration and internal quotation marks omitted); *see also Dobroshi v. Bank of Am., N.A.*, 886 N.Y.S.2d 106, 109 (App. Div. 2009) (same).  Because of the complete overlap in the elements of each claim, the Court finds that resolution of the Trustee's turnover claim—which, again, will be resolved as part of the claims allowance process triggered by Magee's proof of claim—will "necessarily resolve," *Stern*, 564 U.S. at 497, the Trustee's conversion claim, *see In re Tolliver*, 464 B.R. 720, 741 (Bankr. E.D. Ky. 2012) (finding that common law conversion claim would necessarily be resolved by claims allowance process); *but see In re SurfaceMax, Inc.*, No. 14-CV-5896, 2015 WL 5676776, at *5 (Bankr. E.D. N.C. Sept. 25, 2015) (finding that common law conversion claim would not necessarily be resolved by claims allowance process).  Accordingly, the bankruptcy court has final adjudicative authority over the Trustee's conversion claim.

### d.  Counts Seventeen and Eighteen

Counts Seventeen and Eighteen assert claims for equitable subordination of Magee's claims under 11 U.S.C. § 510(b) and recharacterization of Magee's claims from debt to equity,

respectively.  (*See* Compl. ¶¶ 1289–1304.)  The Court agrees with the Trustee that such claims "effect the equitable adjudication of creditors' hierarchically-ordered claims against the res of the estate" and as such the Bankruptcy Court has authority to finally adjudicate such claims that "do not exist independent of a bankruptcy case."  (Pl.'s Opp'n 13 (italics omitted).)

In particular, "the [claims in Counts Seventeen and Eighteen] stem[] from the bankruptcy itself [and] would necessarily be resolved in the claims allowance process" initiated by Magee's filing of his proof of claim.  *Stern*, 564 U.S. at 499; *see also In re Lyondell Chem. Co.*, 467 B.R. at 719 n.5 (noting that the opposition party conceded that the bankruptcy court had final adjudicative authority over the equitable subordination claim "because this claim would necessarily be resolved in the claims allowance process"); *In re TP, Inc.*, 479 B.R. 373, 387 (Bankr. E.D. N.C. 2012) (finding "equitable subordination/recharacterization" claim satisfies *Stern* because it "directly attacks the amount set forth by [the defendant] in the proof of claim"), *reconsideration denied*, 486 B.R. 698 (Bankr. E.D. N.C. Feb. 19, 2013); *In re Blixseth*, No. 09-CV-60452, 2011 WL 3274042, at *11 (Bankr. D. Mont. Aug. 1, 2011) ("[T]he equitable subordination . . . claims arise from the Bankruptcy Code and the claims allowance process, therefore, this [c]ourt's jurisdiction over those claims is constitutionally acceptable."), *amended on denial of reconsideration*, 463 B.R. 896 (Bankr. D. Mont. 2012); *cf. In re: Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231–32 (4th Cir. 2006) (noting that the "implementation of the [Bankruptcy] Code's priority scheme requires a determination of whether a particular obligation is debt or equity" and "[t]hus, even if a claimant is able to meet § 502's minimal threshold for allowance of the claim, the bankruptcy court still must look beyond the form of the transaction to

determine the claim's proper priority").  Accordingly, the claims do not merely seek "to augment the bankruptcy estate," which would require an Article III court to finally adjudicate the claims, but rather they "seek 'a pro rata share of the bankruptcy res,'" rendering final adjudication by the bankruptcy court constitutionally sound.  *Stern*, 564 U.S. at 492 (quoting *Granfinanciera*, 492 U.S. at 56).

### e.  Count Twenty

Count Twenty consists of a spoliation claim against Magee.  (*See* Am. Compl. ¶¶ 1330–51.)  The Trustee requests that the Bankruptcy Court either recognize the findings and conclusions in a state court action related to the spoliation claim or alternatively find that Magee spoliated certain files belonging to Dorfman and grant relief including directing a negative inference instruction against Magee at trial and precluding Magee from using any of the spoliated files in his defense.  (*See id.*)  Though neither Party devotes much of their attention to this claim, the Trustee does claim that "the Bankruptcy Court has clear authority to hear th[e] claim," in Count 20 on account of that court's "inherit authority to enforce court rules."  (Pl.'s Opp'n 19 n.14.)  The Court agrees.

"Bankruptcy courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct."  *In re Green*, 422 B.R. 469, 473 (Bankr. S.D.N.Y. 2010) (internal quotation marks omitted).  This remains true after *Stern*.  *See, e.g.*, *In re Lewis*, 611 F. App'x 134, 136–37 (4th Cir. 2015) (per curiam) (rejecting argument that under *Stern* bankruptcy courts lack authority over attorney disciplinary matters because "[t]he bankruptcy court clearly had jurisdiction over this matter based on the fact that [the attorney] voluntarily presented himself in

the bankruptcy court as an attorney and officer of the court," and "the sanctions [that] were imposed arose from, and were dependent upon, the bankruptcy proceeding"); *Dahiya v. Kramer*, No. 13-CV-3079, 2014 WL 1278131, at *3 (E.D.N.Y. Mar. 27, 2014) (rejecting argument that the "inherent authority" to impose sanctions is a judicial power that may only be exercised by Article III judges), *aff'd*, 593 F. App'x 83 (2d Cir. 2015); *In re David*, 487 B.R. 843, 867 (Bankr. S.D. Tex. 2013) (distinguishing *Stern* on the ground that the bankruptcy court has authority to "police the conduct of parties appearing before it and impose sanctions on those who misbehave"); *see also In re Brown*, 511 B.R. 843, 848 (Bankr. S.D. Tex. 2014) (citing *Stern* for the proposition that "[t]he [bankruptcy] [c]ourt has constitutional authority to enter a final order" in claims seeking civil contempt and imposition of compensatory and coercive sanctions "due to [the parties'] conduct and for spoliation of evidence").

### 2.  Additional *Orion* Factors

As discussed above, the Bankruptcy Court lacks final adjudicative authority over the Trustee's counterclaims in Counts One, Fourteen, Fifteen, and Nineteen.  Regardless, *Orion* dictates consideration of additional factors before determining whether withdrawal of the reference is appropriate.  *See In re Lyondell Chem. Co.*, 467 B.R. at 723 ("The bankruptcy court's authority to enter final judgment on claims is not determinative in deciding whether to withdraw the reference . . . .").  In this case, however, the additional *Orion* factors also support withdrawal of the reference.

### a.  Jury Trial Rights (or Legal vs. Equitable)

*Orion* instructs courts to consider "whether [the claim] is legal or equitable," 4 F.3d at

1101, and "consequently whether the litigants are afforded the right to a jury trial," *In re*

*Extended Stay, Inc.*, 466 B.R. at 197.  If a jury trial were required, this could counsel for

withdrawal of the reference.  *See Orion*, 4 F.3d at 1101 ("[A] district court might find the

inability of the bankruptcy court to hold the trial constitutes cause to withdraw the reference.").

The more imminent and likely a trial is, the more heavily this factor is weighed.  *See, e.g.*, *In*

*Lyondell Chem. Co.*, 467 B.R. at 725 ("If and when the defendants assert their jury trial rights

and/or the case proceeds to trial, then, the defendants are free to move for withdrawal a second

time."); *In re Magnesium Corp. of Am.*, No. 04-CV-1357, 2004 WL 1161172, at *2 (S.D.N.Y.

May 24, 2004) ("[O]ften courts in this District have found it appropriate to defer withdrawing the

reference until the case is trial ready.").  Indeed, a party's right to a jury trial, combined with a

finding that the claim cannot be finally adjudicated by a bankruptcy court, may *require* the Court

to withdraw the reference when the case is ready to proceed to trial.  *See, e.g.*, *In re Lehman*

*Bros. Holding, Inc.*, 480 B.R. at 194–95 ("[A]lthough a party's right to a jury, when coupled with

the court's finding that the claim is not subject to final adjudication in bankruptcy court, might

provide sufficient cause to withdraw the reference, such a right does not compel withdrawing the

reference *until the case is ready to proceed to trial*." (emphasis added) (italics, alterations,

citations, and internal quotation marks omitted)); *Gioia Gucci v. Gucci*, No. 96-CV-8216, 1997

WL 122838, at *1 (S.D.N.Y. Mar. 17, 1997) ("While there is no question that this case must

return to the [d]istrict [c]ourt if and when there is a jury trial, at the present infant stage of the

36

proceeding the issue of withdrawal is discretionary and turns largely on considerations of judicial economy.").[11]  Magee asserts that the case is trial ready.  (Def.'s Mem. 3.)

The Seventh Amendment guarantees "the right of trial by jury" only "[i]n [s]uits at common law."  U.S. Const. amend VII.  "[T]he phrase 'suits at common law' refers to 'suits in which *legal* rights are to be ascertained and determined, in contradistinction to those where equitable rights alone are recognized and equitable remedies are administered.'"  *Pereira v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005) (alterations omitted) (quoting *Granfinanciera*, 492 U.S. at 41).  Accordingly, to determine whether a Seventh Amendment right to a jury trial attaches to the Trustee's claims, the Court must "determine first whether the action would have been deemed legal or equitable in 18th century England, and second whether the remedy sought is legal or equitable in nature.  The [C]ourt must balance the two, giving greater weight to the

---

[11] The Court is likely required to withdraw a reference when a right to a jury trial and a lack of constitutional authority to finally decide the claim exists because of the Seventh Amendment's Reexamination Clause, which provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.  In *Orion*, the Second Circuit noted that the Clause "likely would prohibit jury trials in bankruptcy courts in non-core proceedings due to the district court's de novo review of such proceedings."  4 F.3d at 1101 (italics omitted).  For that reason, the court concluded that bankruptcy courts were constitutionally prohibited from holding jury trials in non-core matters.  *Id.*  The same likely is true for core matters that fall beyond the bankruptcy court's constitutional authority.  In such instances, as with non-core matters, the bankruptcy court could still hear those matters in the first instance and propose findings of fact and conclusions of law to be reviewed de novo by a district court.  *See Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173 (2014) (holding that bankruptcy courts can treat otherwise core claims that may not be adjudicated to final judgment by the bankruptcy court as non-core claims, allowing the bankruptcy court to "hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for de novo review and entry of judgment" (italics omitted)).

latter." *Germain v. CT. Nat'l Bank*, 988 F.2d 1323, 1328 (2d Cir. 1993) (citing *Granfinanciera*, 492 U.S. at 42); *see also Pereira*, 413 F.3d at 337 (same).

### i.  Counts Three Through Nine and Eleven

Counts Three through Nine assert various fraudulent conveyance claims against Magee and Count Eleven asserts a conversion claim against Magee.  (*See* Compl. ¶¶ 544–1208, 1222–29.)[12]  As discussed above, the Supreme Court has clearly stated that "under the Seventh Amendment, a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor has submitted a claim against the estate."  *Granfinanciera*, 492 U.S. at 58; *see also In re Lyondell Chem. Co.*, 467 B.R. at 725 ("The Seventh Amendment conveys a guarantee of a jury trial to a party litigating a fraudulent conveyance action when the party has not filed a claim against the bankruptcy estate and the action is not integral to the restructuring of debtor-creditor relations.").  The filing of a proof of claim, however, "is a necessary but not sufficient condition to forfeiting a creditor's right to a jury trial."  *In re CBI Holding Co.*, 529 F.3d at 466.  Specifically, if the otherwise legal claims "bear[] directly on the allowance of a claim," then the claim becomes equitable and rights to a jury trial are lost.  *Germain*, 988 F.2d at 1329; *see also Stern*, 564 U.S. at 499 (focusing on whether the counterclaim would necessarily be resolved in the claims allowance process); *In re Actrade Fin. Tech., LTD.*, No. 09-CV-1196, 2010 WL 3386945, at *3 (S.D.N.Y. Aug. 23, 2010) (noting that when a creditor files a proof of

---

[12] Magee does not argue that he is entitled to a jury trial with respect to the turnover claim under § 542 or objection claim under § 502(d) (Counts Two and Sixteen).  (*See* Def.'s Mem. 9–10, 12.)  No such right exists because both claims stem directly from the Bankruptcy Court's equitable jurisdiction.

claim, otherwise legal claims that bear directly on the allowance of that claim are "converted to . . . issue[s] of equity" (quoting *Germain*. 988 F.2d at 1329)).  As the Court has already determined, the Trustee's claims in Counts Three through Nine and Eleven bear directly on the claims allowance process invoked by Magee's filing of proofs of claim.  Accordingly, the otherwise legal fraudulent transfer claims and the conversion claim are transformed into equitable claims for which no Seventh Amendment jury trial rights attach.

### ii.  Counts Seventeen and Eighteen

Magee does not argue that he is entitled to a jury trial on Count Seventeen (equitable subordination under § 510(b)), a claim that would not exist outside of the bankruptcy.  (*See* Def.'s Mem. 9–10, 12.)  As with the claims in Counts Two through Nine, Eleven, and Sixteen, Magee's filing of a proof of claim transforms his otherwise common-law recharacterization claim into an equitable claim because it will necessarily be resolved in the claims-allowance process.  Accordingly, Magee is not entitled to a jury trial on either Count Seventeen or Eighteen.  *See, e.g.*, *In re Tenn. Valley Steel Corp.*, 186 B.R. 919, 923–24 (Bankr. E.D. Tenn. 1995) (holding that a claim for equitable subordination or a recharacterization of a loan to equity, involved "the restructuring of the debtor-creditor relationship" and that the plaintiff therefore had no Seventh Amendment right to a jury trial).

### iii.  Counts One, Fourteen, Fifteen, and Nineteen

The Court is left with the following claims:  Breach of Fiduciary Duty and Corporate Waste (Count One), Aiding and Abetting Breach of Fiduciary Duty (Count Fifteen), Contribution (Count Fourteen), and Alter-Ego (Count Nineteen).[13]

### a.  Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

"Courts have held that claims for breach of fiduciary duty are historically equitable in nature."  *McCord v. Papantoniou*, 316 B.R. 113, 123 (E.D.N.Y. 2004).  Thus, the first step of the *Granfinanciera* test "weighs against a jury trial" for the Trustee's breach of fiduciary duty and aiding and abetting claims.  *Pereira*, 413 F.3d at 339.  Step two of the test—the more heavily weighted step—requires the Court to focus on the nature of the relief sought.  *Id.*  The Court must, however, "look[] beyond the Trustee's characterization to what the claim for relief actually [is]."  *Id.* (alterations and internal quotation marks omitted).  The Second Circuit has "articulated two bases to distinguish a breach of fiduciary duty claim seeking compensatory damages (a legal remedy) from a claim seeking restitution (an equitable remedy)."  *Soley v. Wasserman*, No. 08-CV-9262, 2013 WL 1655989, at *2 (S.D.N.Y. Apr. 17, 2013).

First, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or

---

[13] Magee does not argue that he has a right to trial by jury on the spoliation claim in Count Twenty, (*see* Def.'s Mem. 9–10, 12), and no such right exists because of the equitable nature of the claim, *see In re Kelsey*, Nos. 94-CV-10415, 00-CV-1034, 2001 WL 34050736, at *4 (Bankr. D. Vt. Oct. 23, 2001) ("This [c]ourt has discretion to fashion an equitable remedy for the spoliation of evidence, appropriate to the facts of the case, including . . . the exclusion of evidence [and] the use of an adverse evidentiary inference . . . ."), *reconsideration denied*, 272 B.R. 830 (Bankr. D. Vt. 2002).

property *in the defendant's possession*.  Second, where the plaintiff seeks only to recover funds attributable to plaintiff's loss, not the defendant's unjust gain, the action seeks compensatory damages and is legal in nature.

*Id.* (alterations, citation, and internal quotation marks omitted) (citing *Pereira*, 413 F.3d at 340).

In his Complaint, the Trustee seeks to hold Magee "jointly and severally liable for actual and compensatory damages" equaling over $75 million and punitive damages equaling over $20 million.  (*See* Compl. 217–18; *see also id.* ¶¶ 522–23.)  "'[C]ompensatory damages" are, "of course, the classic form of *legal* relief."  *Pereira*, 413 F.3d at 339 (internal quotation marks omitted).  Looking beyond "the choice of words used in the pleadings," as the Court must, *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477–78 (1962), the picture is less clear.  The vast majority of the Trustee's breach of fiduciary duty claims against Magee consist of allegations of widespread self-dealing.  Generally, the Trustee asserts that Magee and the other Principals directed the Debtor to make loans to borrowers in which the principals held significant equity positions. (*See, e.g.*, Compl. ¶ 6.)  To some extent, therefore, the damages the Trustee seeks could be considered both a "recover[y] [of] funds attributable to [a] plaintiff's loss," which sounds of a legal remedy, as well as "the defendant's unjust gain," which sounds in equity.  *Solely*, 2013 WL 1655989, at *2 (alterations and internal quotation marks omitted).  For example, the Trustee alleges that a borrower, Gregory Hayden, remains indebted to the Debtor for $100,000.  (Compl. ¶ 228.)  The Trustee further alleges that Hayden claims to have repaid the debt by writing two checks totaling $100,000, made payable to Magee, and that the two checks were deposited into Magee's personal bank account.  (*Id.* ¶ 229.)  The Trustee seeks damages for this self-interested transaction in the amount of "not less than $100,000."  (*Id.* ¶ 413.)  This amount is susceptible to

41

classification as both Plaintiff's loss, as well as Magee's unjust gain.  (*See id.* ¶¶ 337–46 (seeking to recover $4.2 million that "the Debtor sustained [as] significant damages," which equals the $4.2 million that "[t]he Principals took . . . in draws against their capital accounts collectively in the form of the Membership Distributions"); *id.* ¶¶ 347–55 (seeking to recover $1.339 million that "the Debtor sustained [as] significant damages," which equals the $1.339 million "Magee collected").)

However, the Court concludes that, at bottom, the Trustee's claims for breach of fiduciary duty against Magee seek a legal remedy.  While there is no doubt that some of the losses sustained by the Debtor are equal to the allegedly unjust gains of Magee, each alleged breach of the fiduciary duty seeks to hold Magee and the other Principals *personally liable* for the Debtor's *entire* loss resulting from each breach.  (*See, e.g.*, *id.* ¶¶ 368–78 (seeking $2.7 million in damages for total amount of loans and transfers made from the Debtor to an entity, despite Principals possessing only a 50% interest in the entity).  Additionally, some of the breaches alleged in the Complaint involved loans made to entities in which the Principals had no ownership interest, and thus they could not have been unjustly enriched through the breach.  (*See, e.g.*, Compl. ¶¶ 452–60.)  In all, according to the Amended Complaint, $45 million of the Debtor's borrowed capital was loaned to projects owned, in whole or in part, by the Principals, (Am. Compl. ¶ 1313), but the Trustee seeks damages of no less than $75 million for the breach of fiduciary duty claims, (Compl. ¶¶ 522–23).  Finally, the Trustee seeks punitive damages, which is a "traditional form of relief offered in the courts of law."  *Curtis v. Loether*, 415 U.S. 189, 196 (1974).  Accordingly, Magee has a Seventh Amendment right to a trial by jury on the

breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims in Counts One and Fifteen.

### b.  Alter-Ego

The Second Circuit has conducted a thorough historical analysis of the origins of the alter-ego doctrine and concluded that "disregarding the corporate form had [both] equitable and legal components," and that "the doctrine has been applied in courts both of law and equity." *Wm. Passalacqua Builders*, 933 F.2d at 135–36.  Whether Magee has a Seventh Amendment right to a jury trial on the Trustee's alter-ego claim will therefore turn on step two of the *Granfinanciera* test—the nature of the remedy sought.

In *Passalacqua*, the plaintiffs brought suit to hold a company's alleged alter-ego liable for a money judgement obtained against the company.  *Id.* at 136.  The Second Circuit concluded that the "nature of the relief sought," which ultimately amounted to a "claim for money," was "relief typically achieved in an action at law."  *Id.*  Because the nature of the relief sought was legal, "it was entirely proper for the district court to submit the corporate disregard issue to the jury."  *Id.*  While some courts have disagreed with the Second Circuit's holding in *Passalacqua*, *see, e.g.*, *Int'l Fin. Servs. Corp. v. Chromas Tech. Can., Inc.*, 356 F.3d 731, 736–39 (7th Cir. 2004); *Siegel v. Warner Bros. Entm't Inc.*, 581 F. Supp. 2d 1067, 1075–76 (C.D. Cal. 2008), "[t]he weight of authority appears to recognize a right to jury trial with respect to claims seeking to pierce the corporate veil," because "where such claims seek to impose liability upon the defendant for the debts or obligations of another, [courts have concluded] the remedy sought is

monetary damages and, hence, is legal in nature," *In re Bonds Distrib. Co.*, Nos. 97-CV-52130, 98-CV-6044, 2000 WL 33682815, at *8 (Bankr. M.D. N.C. Nov. 15, 2000).

Moreover, "[t]hat [the Trustee] use[s] equitable procedural means to pursue that remedy, or that the funds have not yet been disbursed, does not alter the legal nature of [his] claims." *Iantosca v. Benistar Admin. Servs., Inc.*, 843 F. Supp. 2d 148, 153 (D. Mass. 2012).  Because the Trustee's alter-ego claim seeks to hold Magee and the other Principals "individually, jointly and severally, responsible for satisfying any and all debts of the Debtor," (Am. Compl. ¶ 1329), in an effort to ultimately obtain money damages from the Principals, Magee has a right to a jury trial with respect to the claim, *see In re G-I Holdings, Inc.*, 380 F. Supp. 2d 469, 477 (D. N.J. 2005) ("Common sense tells the [c]ourt that no party seeks to pierce the corporate veil merely to strip a company of its corporate protection; the underlying purpose of a veil-piercing claim in a lawsuit seeking the determination of damages is to obtain money relief."); *In re Bonds Distrib. Co.*, 2000 WL 33682815, at *8 ("Based upon . . . the fact that . . . the claim, in effect, seeks monetary damages from [the defendant] by imposing liability upon him for the liabilities of [the debtor], . . . the defendants have a right to [a] jury trial with respect to the [piercing the corporate veil claim]."); *cf. Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 59 (2d Cir. 1988) ("[T]he issue of corporate disregard is generally submitted to the jury."); *FMC Fin. Corp. v. Murphree*, 632 F.2d 413, 421 n.5 (5th Cir. 1980) ("[T]he issue of corporate entity disregard is one for the jury."); *but see In re iPCS, Inc.*, 303 B.R. 527, 531 (Bankr. N.D. Ga. 2003) (distinguishing *Passalacqua* on the ground that any eventual liability the defendant would face as a result of a determination of an alter-ego claim would be asserted by the individual creditors, not the bankruptcy estate;

44

therefore, the bankruptcy estate's alter-ego claim is "essentially asking the [c]ourt to declare that another party is responsible for payment of the debts of the estates," which is "entirely equitable").

### c.  Contribution

At the outset, the Court notes that there is some disagreement among courts regarding whether a right to a jury trial attaches to a claim for contribution.  *Compare, e.g.*, *S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1433 (D. S.C. 1990) ("Claims for contribution are equitable in nature and therefore not triable to a jury."), *with Evans v. Union Bank of Switz.*, No. 01-CV-1507, 2003 WL 21804984, at *3 (E.D. La. Aug. 4, 2003) ("[T]he parties to the contribution action are entitled to a trial by jury, even if the original plaintiffs are not party to the suit.").  The Trustee contends that courts have "held that claims in contribution are inherently equitable in nature."  (Pl.'s Opp'n 20 (citing *Blum v. Good Humor Corp.*, 394 N.Y.S.2d 894, 896 (App. Div. 1977)).)  While it is true that "the right to contribution is based upon principles of justice and equity," *Blum*, 394 N.Y.S.2d at 896, a claim can be legal "notwithstanding that the rationale underlying such causes of action is fairness and equitable principles in a general, rather than legal, sense," *Hudson View II Assocs. v. Gooden*, 644 N.Y.S.2d 512, 516 (App. Div. 1996); *cf. In re N-500L Cases*, 691 F.2d 15, 20 (1st Cir. 1982) (noting that a number of courts "that call contribution an equitable doctrine use the term in its sense of fairness and justice and do not address the jury trial question").  Accordingly, that the right to contribution is grounded in principles of equity does not entirely resolve whether Magee has a jury trial right for the contribution claim.

45

The First and Ninth Circuits have held that courts addressing the question should look to the nature of the liability and damages underlying the contribution claims and that a right to a jury trial depends upon whether the nature of the liability and damages were legal or equitable. *See In re N-500L Cases*, 691 F.2d at 21; *Palmer v. United States*, 652 F.2d 893, 895–96 (9th Cir. 1981), *overruled on other grounds by White v. McGinnis*, 903 F.2d 699 (9th Cir. 1990).  In their respective cases, the First and Ninth Circuits found that a right to a jury trial attached to the contribution claims at issue because each claim required a determination as to rights and liabilities traditionally arising in common law suits for negligence and each sought to recover a portion of damages the plaintiff seeking contribution was required to pay.  *See In re N-500L Cases*, 691 F.2d at 21 ("At the heart of the . . . appellees' contribution claims are allegations of [the] appellants' negligence liability towards the plaintiffs and a claim for damages."); *Palmer*, 652 F.2d at 896 (finding that a right to a jury trial attached because adjudicating the contribution claim "involve[d] determinations of rights and liabilities traditionally arising in common law suits for negligence" and "s[ought] to recover . . . a portion of the damages" the party claiming contribution was required to pay); *see also Evans*, 2003 WL 21804984, at *3 (holding that the parties were entitled to a jury trial on the contribution claim because the claim "require[d] the fact-finder to determine whether the contribution defendant is liable in tort to the original plaintiff . . . and, if so, the extent of damages caused thereby to the original plaintiff").[14]

---

[14] Both *In re N-500L Cases* and *Palmer* rely, in part, on the Supreme Court's decision in *Ross v. Bernhard*, 396 U.S. 531 (1970), for the proposition that the right to a jury trial is not "dependent on the character of the overall action but rather is to be determined by looking to the nature of the issue to be tried."  *See In re N-500L Cases*, 691 F.2d at 19; *Palmer*, 652 F.2d at 895.  The Second Circuit recently cautioned against an "expansive interpretation of *Ross*" and its

The Trustee seeks contribution from Magee "for [his] proportionate share of damages to the Debtor's creditors, in an amount to be determined at trial," asserting as a basis for liability Magee's breach of fiduciary duty to the Debtor's creditors.  (*See* Compl. ¶¶ 1262–65.)  As discussed above, although a breach of fiduciary duty claim has its roots in equity, such a claim is deemed legal if the nature of the relief is legal, which is the case here.  Accordingly, the issues underlying the contribution claim are legal, thus entitling Magee to a jury trial as to that claim.  *See In re N-500L Cases*, 691 F.2d at 21 (concluding that, because the contribution claim against the appellant contained "underlying issues of negligence liability and damages[,] [which] are legal in nature," the appellant was entitled to a jury trial on the claim).[15]

---

"nature of the issues" test when it rejected the argument that a breach of fiduciary duty claim was a legal claim merely because the claim would require the fact-finder to apply a gross negligence standard.  *Pereira*, 413 F.3d at 338–39; *see also Solely*, 2013 WL 1655989, at *1 (stating that *Pereira* "squarely rejected" the argument that a breach of fiduciary duty claim was legal because the claim alleged that the duties were breached through fraud, breach of contract, and negligence). The Second Circuit has thus read *Ross* as "merely requir[ing] courts to look beyond the procedural vehicle of a shareholders derivative suit to the possible legal nature of the corporation's underlying claims."  *Pereira*, 413 F.3d at 339.

Looking beyond the character of a contribution action and considering the nature of the underlying issues does not run afoul of the Second Circuit's holding in *Pereira*.  "The 'right of action' for contribution is no more than a procedural device for equitably distributing responsibility for [a] plaintiff's losses proportionally among those responsible for the losses, and without regard to which particular persons [a] plaintiff chose to sue in the first instance." *Chemung Canal Tr. Co. v. Sovran Bank/Md.*, 939 F.2d 12, 15–16 (2d Cir. 1991); *see also Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 311 (5th Cir. 1998) ("[T]he Ross case [is] controlling not only for derivative actions but also for the other procedural devices that the Civil Rules borrowed from equity." (quoting 9 Wright & Miller, *Federal Practice and Procedure*, § 2307 at 29)).

[15] Although Count Fourteen does not explicitly list fraud as an additional basis of liability for the Principals, the contribution claim does note that "[t]he Principals' fraud on the Debtor's creditors has exposed the Debtor to millions of dollars in liabilities to the Debtor's creditors." (Compl. ¶ 1260.)  If the contribution claim required adjudication of the issue of liability and damages arising from fraud, this would lend further support for a finding of a jury trial right.

### b.   Considerations of Efficiency, Prevention of Forum Shopping, and Uniformity in the Administration of Bankruptcy Law

Having determined that the Bankruptcy Court lacks the constitutional authority to finally adjudicate the Trustee's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, alter-ego liability, and contribution, and that the Seventh Amendment requires that Magee have a jury trial as to those claims, the reference must be withdrawn, at a minimum, as to those claims, given that the case is trial ready. *See, e.g.*, *Gucci*, 1997 WL 122838, at *1 ("While there is no question that this case must return to the [d]istrict [c]ourt if and when there is a jury trial, at the present infant stage of the proceeding the issue of withdrawal is discretionary and turns largely on considerations of judicial economy.").  The question remains whether the court should:  (1) withdraw only the claims listed above as to Magee and allow the remaining claims against Magee and the remainder of the Adversary Proceeding against the other Defendants to be tried in the Bankruptcy Court, (2) withdraw the entire proceeding as to Magee and allow the remainder of the Adversary Proceeding against the other Defendants to be tried in the Bankruptcy Court, or (3) withdraw the entire Adversary Proceeding as to Magee and the other Defendants.  *See* 28 U.S.C. § 157(d) (providing that a court may withdraw a reference "on its own motion . . . for cause shown").  This question will turn on consideration of the final *Orion* factors:  efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law.  *See Orion*, 4 F.3d at 1101.

---

*See, e.g.*, *Chevron Corp. v. Donziger*, No. 11-CV-691, 2013 WL 5526287, at *2 n.7 (S.D.N.Y. Oct. 7, 2013) (noting the "uncontroversial proposition that there is a right to trial by jury of a common law fraud claim that seeks money damages").

The Trustee contends that withdrawal of the reference would encourage forum shopping. Specifically, he argues that Magee "want[s] to get away from the Bankruptcy Court, where [he] ha[s] unsuccessfully litigated for years." (*See* Pl.'s Opp'n 22–25.) The Trustee outlines a litany of unsuccessful "motions, claims, lawsuits[,] and positions" taken by Magee in the Bankruptcy Court to try to frustrate the Trustee's efforts to recover money for the Debtor's creditors. (*Id.* at 22–23.) According to the Trustee, this is evidence that Magee "now seeks to get away from the Bankruptcy Court," which has proved to be an unfavorable forum for Magee. (*Id.* at 24.) But the Trustee does not explain how the unsuccessful motions or objections (such as a motion seeking to convert the Debtor's case to a Chapter 7 case, or an objection to the Debtor's motion to expand the time period by which it could remove actions to the Bankruptcy Court) demonstrate that the Bankruptcy Court has tipped its hand on its views as to the merits of the claims in the relevant Adversary Proceeding to such an extent that Magee would forum shop for a new adjudicator. *See In re N.Y. Trap Rock Corp.*, 158 B.R. 574, 577 (S.D.N.Y. 1993) ("Forum shopping efforts [were] pursued by awaiting a decision relevant to the merits and then bypassing or filing a motion to transfer . . . ."). Accordingly, it is unclear whether Magee is engaged in forum shopping or simply seeks to exercise his constitutionally protected right to a jury trial, *see In re The VWE Grp., Inc.*, 359 B.R. 441, 451 (S.D.N.Y. 2007) ("[W]ithdrawing the reference will not result in forum-shopping because, due to [the] defendants' demand for a jury trial on this non-core claim, the parties have no choice but to try the case in this court."); *see also In re FMI Forwarding Co.*, No. 01-CV-9462, 2004 WL 1348956, at *7 (S.D.N.Y. 2004) (same), and thus forum shopping concerns do not necessarily weigh in favor of denying Magee's Motion.

However, the desire for uniformity in the administration of bankruptcy law does counsel in favor of leaving the remaining claims with the Bankruptcy Court.  The claims for which that court has constitutional authority to enter final judgment are for the most part core bankruptcy claims and are claims specifically addressed in the Bankruptcy Code.  *See In re Lehman Bros. Holdings Inc.*, 480 B.R. at 196 (finding that "the policy of promoting uniformity of bankruptcy administration . . . weighs against withdrawal" in part because "[t]he bankruptcy court has a wealth of knowledge and experience with fraudulent transfer claims" (internal quotation marks omitted)); *In re Iridium Operating LLC*, 285 B.R. 822, 835 (S.D.N.Y. 2002) ("[T]he consistent administration of bankruptcy law would be best served by the [b]ankruptcy [c]ourt adjudicating the adversary proceeding, especially when [it] includes five traditionally core causes of action along with . . . five traditionally non-core causes of action.").

Finally, the Court acknowledges that some inefficiencies will result whether the remaining claims are withdrawn or not.  As the Trustee points out, the Bankruptcy Court "is fully familiar with the case and prepared to move forward with a trial expeditiously."  (Pl.'s Opp'n 25.)  The Bankruptcy Court has presided over the Debtor's bankruptcy and this particular Adversary Proceeding for years and is thus familiar with the relevant facts and law, militating in favor of permitting that court to resolve the remaining claims.  *See, e.g.*, *Nisselson v. Salim*, No. 12-CV-92, 2013 WL 1245548, at *6 (S.D.N.Y. Mar. 25, 2013) (denying motion to withdraw in part because "[t]he [b]ankruptcy [c]ourt is familiar with the bankruptcy estate as a whole, having overseen its administration" for two years); *In re Extended Stay, Inc.*, 466 B.R. at 206 ("Judicial economy would be promoted by allowing the bankruptcy court, already familiar with the

50

extensive record in this case, to initially adjudicate these cases.").  Additionally, withdrawing the

claims arising under bankruptcy law "could be an inefficient allocation of judicial resources

given that the [B]ankruptcy [C]ourt generally will be more familiar with the facts and issues"

involved in those claims.  *In re Orion*, 4 F.3d at 1101; *see also Nisselson*, 2013 WL 1245548, at

*6 (finding that resolution of claims by the bankruptcy court would be more efficient in part

because bankruptcy courts are "more familiar with avoidance actions, which are customarily

adjudicated by bankruptcy courts").

      However, given the substantial factual overlap among the various claims and Defendants,

it would be inefficient to try this case in separate courts.  Many of the fraudulent transfer claims

correspond to the same transfers at issue under the breach of fiduciary duty claims, making

adjudication of those claims in separate courts inefficient.  *See, e.g.*, *In re TMST, Inc.*, No. 15-

CV-75, 2015 WL 4080077, at *9 (D. Md. July 6, 2015) ("The [d]efendants . . . argue that it

would be 'unworkable' to split this lawsuit (i.e., to withdraw the reference as to only *some*

claims).  The [c]ourt agrees, and will not split these proceedings." (citation omitted)); *In re*

*Corson Mfg.*, No. 00-AP-1366, 2001 WL 877394, at *2 (W.D.N.Y. June 27, 2001) (noting

concern that "severing the non-core claims from the core claims would likely result in

duplicative presentations on substantially overlapping factual matters and cause unnecessary

delay and deplete both judicial resources and the assets of the bankruptcy estate" (internal

quotation marks omitted)); *Met-Al, Inc. v. Hansen Storage Co.*, 157 B.R. 993, 1002 (E.D. Wisc.

1993) (noting that "both causes of action ar[o]se out of a common set of facts" and "were to be

tried together in bankruptcy court," and concluding "it would be a waste of judicial resources for

51

two separate trials to be conducted in two separate courts"); *cf. In re Chateaugay Corp.*, No. 00-CV-9429, 2002 WL 484950, at *7 (S.D.N.Y. Mar. 29, 2002) ("[C]ourts frequently exercise their discretion to withdraw the reference if the bankruptcy action involves common questions of law and fact with a pending district court action.").  Also, the various Defendants are alleged to have held interests together in the numerous entities that received the loans at issue in the breach of fiduciary duty and fraudulent transfer claims, which would likely render removing only the claims as to Magee unworkable.  *See, e.g.*, *Dev. Specialists, Inc.*, 462 B.R. at 472 ("To the extent that [the defendant's] case raises issues identical to those that would be raised in the other cases, it would be a waste of judicial resources to allow the actions to proceed separately.").  For example, the Trustee alleges that "[t]he Principals owned FKF Edgewater," which in turn had a 15%, and eventually, a 51% interest in Aventine Edgewater, a project in which the Debtor allegedly invested over $6.5 million.  (Compl. ¶¶ 356–57.)  This arrangement is at issue in both the breach of fiduciary duty claims, (*id.* ¶¶ 356–67), and various fraudulent transfer claims, (*see, e.g.*, *id.* ¶¶ 561–69).  Trying claims related to the same transactions in different courts would be inefficient and would risk inconsistent findings.  Indeed, both Magee and the Trustee acknowledge that the most efficient use of judicial resources would be to have only one trial in one court; unsurprisingly, the parties do not agree on which court that should be.  (*See* Def.'s Mem. 12 ("It would be unnecessarily wasteful and inefficient to have the Bankruptcy Court hear the remaining claims in the Trustee's complaints that do not involve common-law rights of action, and then try the remaining issues before this Court."); Pl.'s Opp'n 25 ("The most efficient means of resolving the claims is to have a single trial in the Bankruptcy Court.").)

Although the Court acknowledges that some *Orion* factors do favor having the Bankruptcy Court adjudicate the remaining claims in the first instance, the overall factual similarity among the various claims, Defendants, and factual issues would render multiple proceedings too wasteful to allow. Accordingly, the Court withdraws the reference as to the entire Adversary Proceeding.

### III. Conclusion

For the reasons stated herein, Magee's Motion to Withdraw the Reference is granted. The Adversary Proceeding will be heard by this Court in its entirety.

SO ORDERED.

Dated: August 30 , 2016
      White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE